## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |  |
|---|---|---|
| **KRISTINA KING and KEN KING,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **CIVIL ACTION** |
| **7-ELEVEN, INC.,** | ) ) ) | **1:19-cv-00338** |
| **Defendant.** | ) | |

## COMPLAINT

## I. INTRODUCTION

Plaintiffs, Kristina King and Ken King (hereinafter "the Kings"), file this Title III, ADA action, pursuant to 42 U.S.C. §12181, *et seq.* In Count One of the Complaint, Plaintiffs seek to enjoin the Defendant to remove architectural barriers. In Count Two of the Complaint, the Plaintiffs seek to enjoin the Defendant to maintain policies, practices, and procedures necessary to maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three of the Complaint, the Plaintiffs seek to enjoin the Defendant's use of the premises to provide full and equal enjoyment of the premises to the disabled. Counts Two and Three of the Complaint seek independent relief in addition to the removal of architectural barriers. Count Four of the Complaint seek to enjoin the Defendant's

failure to design and construct the establishment to ADA compliance. In Count Five of the Complaint, the Plaintiffs seek to enjoin the Defendant to remediate its website which fails to integrate an accessible platform usable by disabled individuals. In Count Six of the Complaint, the Plaintiffs seek to enjoin the Defendant's failure to take necessary steps to ensure the Plaintiffs are not denied services, segregated, or otherwise treated differently than individuals who do not have disabilities via the services offered on www.7-eleven.com.

## JURISDICTION, PARTIES, AND ARTICLE III STANDING

1. Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act (hereinafter referred to as the "ADA"), 42 U.S.C. §12181, *et seq.*, and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2. Venue is proper in this Court, the United States District Court for the Western District of Texas, pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Western District of Texas.

3. Plaintiff, Kristina King is paraplegic. Specifically, Mrs. King suffered a spinal cord injury and is permanently confined to a wheelchair that limits her ability to perform manual tasks, walk, stand, lift, bend, and grab, all of which are major life activities pursuant to 42 U.S.C. §12102 (2)(A).  As result of Mrs. King's disability, she requires the use of mobility aids and assistive technology.  Because

she suffers a physical impairment substantially limiting one or more major life activities, Mrs. King is disabled pursuant to the ADA. 42 U.S.C. § 12102; *see also* 28 C.F.R. § 36.104.

4. Plaintiff, Ken King, is married to Kristina King and is not disabled. However, as result of association with a disabled individual, Mr. King suffered associational discrimination under the ADA pursuant to 42 U.S.C §12182(b)(1)(E); 28 C.F.R. §36.205. "In order to have Article III and statutory standing to bring an associational discrimination claim under the ADA, 'a plaintiff must allege some 'specific, direct and separate injury' as a result of association with a disabled individual." *Nevarez v. Forty Niners Football Company, LLC.,* No. 16-CV-07013-LHK, 2017 WL 3288634, at *5 (N.D. Cal. Aug. 1, 2017).

5. Mr. King suffered a direct and separate injury because he assisted and accompanied Mrs. King on all her visits to the 7-Eleven stores. It was his *own* desire to visit the stores with Mrs. King, but he suffered injuries in doing so because the Defendant denied Mrs. King full and equal accessibility. Mr. King experienced frustration, emotional distress, physical exhaustion and discrimination as result of being forced to assist his disabled wife to traverse and overcome numerous access barriers at the stores.

6. Defendant, 7-Eleven, Inc. (hereinafter "7-Eleven"), is a corporation that is both registered to conduct business and is conducting business within the State of

Texas sufficient to create both general and specific *in personam* jurisdiction. Upon information and belief, 7-Eleven owns and operates the real properties and its improvements located at 1403 S Lamar Blvd, Austin, TX 78704; 2820 S Lamar Blvd, Austin, TX 78704; and 2620 Lake Austin Blvd, Austin, TX 78703. 7-Eleven convenience stores are a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

7. Upon information and belief, 7-Eleven, Inc. "owns" the public internet website www.7-eleven.com and the goods and services offered on the world-wide website services that are available to the public at 7-Eleven stores. It is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services. 42 U.S.C. § 12182. Consistent with the text and legislative history of the ADA, the Department of Justice (hereinafter "Department") has long affirmed the application of Title III of the ADA to websites of public accommodations. Legislative history also supports that websites of public accommodations are covered under Title III. Congress' purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), having found that "discrimination against individuals with disabilities persists in such critical areas as . . . public

accommodations . . ." and that "many people with physical or mental disabilities have been precluded from [fully participating in all aspects of society]." 42 U.S.C. § 12101(a)(3) and (1).  Although the internet did not exist when Congress enacted the ADA in 1990, Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations.  Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations over their websites.  *See Nat'l Fed'n of the Blind v. Scribd*, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

8.  All events giving rise to this lawsuit occurred in the Western District of Texas and the Defendant is a citizen thereof.

9.  Plaintiffs, the Kings, have resided in the Austin area for over 10 years and live approximately 28 miles from the Defendant's locations referenced above.  The Kings shop, eat, and enjoy a variety of entertainment near where 7-Eleven stores are located. In fact, the Kings visit the area where 7-Eleven stores are located about regularly to shop or browse other shops, dining and entertainment. The Kings intend to continue visiting 7-Eleven stores because they offer "convenient and user-friendly technology that earns customers free products to having an ice-cold SLURPEE® drink", they are the "leader in convenience" and they "constantly put [their] customers at the center of design and development." Per

7-Eleven Founder: *"Give the customers what they want, when and where they want it."* Because of the barriers described below and throughout the Complaint, the Plaintiffs have been denied full and equal enjoyment of the Defendant's premises based on Mrs. King's disabilities.

10. The Kings will return not only to shop at the 7-Eleven stores, but to confirm ADA compliance by 7-Eleven. The Kings do not know exactly when they will return to the 7-Eleven stores because they have not planned out every shopping trip for the rest of their lives. Such specific planning is not necessary to invoke the ADA. See, e.g. *Parr v. L & L Drive Inn Restaurant*, 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and *Segal v. Rickey's Restaurant and Lounge, Inc.* No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment.*"). The Kings certainly intend to return to the 7-Eleven stores, even after all ADA Title III violations are remediated.

11. Accordingly, Plaintiff, Mrs. King, has Article III standing to pursue this case because (1) she is disabled, pursuant to the statutory and regulatory definition; (2) the Defendant's stores are a place of public accommodation, pursuant to the statutory and regulatory definition; (3) she has suffered a concrete and particularized injury by being denied access to the stores by architectural barriers,

by being denied access by the Defendant's practices described throughout this Complaint, and by being denied full and equal enjoyment of the use of the stores as the able-bodied, as described throughout the Complaint, and (4) because of these injuries there exists a genuine threat of imminent future injury, as described below.

12. Plaintiff, Mr. King, has Article III standing to pursue this case under associational discrimination pursuant to 42 U.S.C §12182(b)(1)(E); 28 C.F.R. §36.205, because (1) he has association to a disabled individual as Mrs. King's husband; (2) the Defendant's stores are a place of public accommodation pursuant to the statutory and regulatory definition; (3) he has suffered a separate concrete and particularized injury because he experienced frustration, emotional distress, physical exhaustion, and discrimination as further described in Paragraph 5, and (4) because of these injuries there exists a genuine threat of imminent future injury, as described below.

## I.    PLAINTIFFS' CLAIMS

### ADA, Title III

13. On or about July 26, 1990, Congress enacted Title III of the ADA, 42 U.S.C. §12181 *et seq*. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42 U.S.C. §12181; 20 C.F.R. §36.508 (A);

*see also*, § 36.304).

14. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendant's establishments are a place of public accommodation in that it is a convenience store providing goods and services to the public. Accordingly, it is covered by the ADA and must comply with the Act.

**COUNT ONE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(iv)**
***(Architectural Barriers)***

**Defendant's Existing Facility Is Subject to the 2010 ADA Design Standards**
**for the Portions of the Facility Addressed in this Complaint**

15. The Plaintiffs are informed and believe based on publicly available information that the building in which 7-Eleven is located at 1403 S Lamar Blvd, Austin, TX 78704 was first constructed in 1999. The Plaintiffs are informed and believe based on publicly available information that the building in which 7-Eleven is located at 2820 S Lamar Blvd, Austin, TX 78704 was first constructed in 1982. The Plaintiffs are informed and believe based on publicly available information that the building in which 7-Eleven is located at 2620 Lake Austin Blvd, Austin, TX 78703 was first constructed in 1984.

16. The Plaintiffs are further informed and believe based on publicly available information that the establishment in which the 7-Eleven is located at 1403 S Lamar Blvd, Austin, TX 78704, underwent alterations and/or improvements to

the establishment in 2009. The Plaintiffs are informed and believe based on publicly available information that the establishment in which the 7-Eleven is located at 2820 S Lamar Blvd, Austin, TX 78704, underwent alterations and/or improvements to the establishment in 1984, 1991, 1996 and 2004. The Plaintiffs are informed and believe based on publicly available information that the establishment in which the 7-Eleven is located at 2620 Lake Austin Blvd, Austin, TX 78703, underwent alterations and/or improvements to the establishment in 1991 and 2004.

17. The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an existing facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All alterations made to existing facilities after January 26, 1992, and all new construction after January 26, 1993, must be readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. 42 U.S.C. § 12183(a) - (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by . . ." is the new construction standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the new construction standards is if the design and construction of the building to be readily accessible and usable is structurally

impracticable. 42 U.S.C. § 12183(a)(1). The structural impracticability defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to and usable by . . ." is also the alterations standard. 42 U.S.C. § 12183(a)(2). Alterations must be made to the maximum extent feasible. 42 U.S.C. § 12183(a)(2); 28 *C.F.R.* § 36.402. An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 *C.F.R.* § 36.402(b).

18. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 C.F.R. § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 C.F.R. § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after

September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 C.F.R. § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable. *See* 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."

19. For the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable.

## Plaintiffs' Concrete and Particularized Standing to Pursue an Injunction

20. The Defendant has discriminated, and continue to discriminate, against the Plaintiffs, and others who are similarly situated, by denying full and equal access to, and full and equal enjoyment of goods, services, facilities, privileges,

advantages and/or accommodations at Big A in derogation of 42 U.S.C. § 12101 *et seq*., and as prohibited by 42 U.S.C. § 12182 *et seq*. As new construction, the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183 (a) - (b). The Defendant's failure to remove the existing barriers thus violates 42 U.S.C. § 12182(b)(2)(A)(iv), which requires removal of architectural barriers.

21.   As described above, prior to the filing of this lawsuit, the Plaintiffs were denied full and safe access to all the benefits, accommodations, and services offered to individuals without disabilities within and about the Defendant's establishment. The Plaintiffs' access was inhibited by each of the described architectural barriers detailed in this Complaint, which remain at the establishment in violation of the ADA. Because of the foregoing, the Plaintiffs have suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

22.   The Defendant also has discriminated, and continues to discriminate against the Plaintiff, Mr. King, by denying equal goods, services, facilities, privileges, advantages, accommodations, and/or other opportunities at 7-Eleven stores based on the known disability of an individual with whom Mr. King is known to have a relationship and association. Mr. King assisted and accompanied Mrs. King on all her visits to 7-Eleven stores and it was his own desire to visit the stores with Mrs. King, but he suffered injuries in doing so because the Defendant denied

Mrs. King full and equal accessibility. Mr. King experienced frustration, emotional distress, physical exhaustion and discrimination as described in Paragraph 5.

23.  The Plaintiffs have definite plans to return to 7-Eleven stores in the future, as described in above. The Plaintiffs will return to 7-Eleven stores not only to not only to shop and fuel, but also to see if 7-Eleven has repaired the barriers and changed its practices and procedures in each of the establishment-locations referenced earlier. The Plaintiffs will continue to shop and fuel at 7-Eleven stores since they are near other shops, eats and entertainment as they have in the past and in the near future, and even when 7-Eleven stores are repaired, because 7-Eleven offers "convenient and user-friendly technology that earns customers free products to having an ice-cold SLURPEE® drink", 7-Eleven is the "leader in convenience and it constantly put its customers at the center of design and development." Also, of vital importance, the barriers are not just created by construction issues; instead, many of them come from human activity from the way the management and the workers at 7-Eleven use its physical facilities. The barriers created by human activity will need to be reviewed forever to be sure Defendant's management and workers continuously act in a manner that does not create barriers. Absent remedial action by the Defendant, the Plaintiffs will continue to encounter the architectural barriers, and the discriminatory policies,

practices, and procedures described herein and as a result, be discriminated against by the Defendant based on Mrs. King's disability. The Eleventh Circuit, held in *Houston v. Marod Supermarkets*, 733 F.3d 1323 (11th Cir. 2013), that when architectural barriers have not been remedied "*there is a 100% likelihood that plaintiff… will suffer the alleged injury again when he returns to the store*." Additionally, *"[A]n alleged constitutional infringement will often alone constitute irreparable harm." United States v. Arizona*, 2011 WL Case 1:11-cv-01804-TWT at *19; see also *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (*finding "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."*)). Due to the certainty of Plaintiffs' plans to continue visiting the subject facilities together, their past patronage, and their travel near the Defendant's establishments, there exists a genuine threat of imminent future injury, *Houston v. Marod, supra*.

## **Architectural Barriers**

24. Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

25. The Plaintiffs have been from the parking lot to the entrance; from the entrance to the restroom; the restroom itself; from the entrance to the sales/service

counters; the sales/service counters themselves; throughout circulation paths and accessible routes, and service areas, paths of travel, and particularly, but not limited to, all of which is more specifically described below. Moreover, the Defendant's facilities located at 1403 S Lamar Blvd, Austin, TX 78704 and 2820 S Lamar Blvd, Austin, TX 78704, violate the ADA in the parking lots, restrooms, sales/service counters, and particularly, but not limited to:

A. Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendant's place of public accommodation which includes but is not limited to the following failures of the Defendant:

(a) Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to parking spaces failing to be located on the shortest accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its

associated elements as unusable by disabled individuals;

**(b)** The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the level parking spaces measure 96 inches wide minimum with adjoining compliant access aisles that measure 60 inches wide minimum and connect to an accessible route to the entrance of the establishment;

**(c)** The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

**(d)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(e)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces

are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(f)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**B.** Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible van parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendant's place of public accommodation which includes but is not limited to the following failures of the Defendant:

**(a)** Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in

all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to van parking spaces failing to be located on the shortest accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

**(b)** The parking area fails to maintain the required amount of accessible van accessible parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space measures 132 inches wide minimum with an adjoining compliant access aisle that measures 60 inches wide minimum, or alternatively a 96 inch wide space with an adjoining 96 inch wide access aisle, and connects to an adjoining accessible route to the entrance of the establishment;

**(c)** The parking area fails to maintain the required amount of accessible van parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking spaces adjacent access aisle extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

**(d)** The parking area fails to maintain the required amount of accessible van

parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(e)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(f)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**C.** Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible

entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendant's place of public accommodation which includes but is not limited to the following failures of the Defendant:

**(a)** Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to providing all of the necessary components on the ADA accessible route to the entrance including without limitation ramps, walking surfaces, and other associated elements which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals.

**(b)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the adjacent surfaces at transitions at curb ramps to walks, gutters, and streets are at the same level;

**(c)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the running slope is not steeper than 1:12.

**(d)** The accessible route fails to maintain a ramp and its associated components

in operable condition by conforming with the ADA Standards for Accessible Design so that the cross slope is not steeper than 1:48.

**(e)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that there are no changes in level other than the running slope and cross slope.

**(f)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design in all the ways that are required to be usable by the disabled which includes but is not limited to providing a ramp that is 36 inches wide minimum with a level landing at the top and bottom of the ramp measure 60 inches long minimum and at least as wide as the ramp;

**(g)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the curb ramp does not project into vehicular traffic lanes, parking spaces, or parking access aisles;

**(h)** Defendant fails to maintain at least one accessible entrance that provides a door conforming to the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which includes but is not limited to maintaining an

independently accessible and usable entrance door to the establishment so that disabled individuals are not outright excluded from being afforded the opportunity to enter the establishment;

**(i)** Defendant fails to maintain an accessible route to the entrance in operable usable condition by conforming with the ADA Standards for Accessible Design so that walking surfaces are not obstructed which has the discriminatory effects in practice of rendering the entire establishment and its goods and services as unusable by disabled individuals;

**D.** Defendant fails to maintain the accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals, which includes but is not limited to maintaining at least one accessible route that connects the facility entrance with all accessible spaces and elements within the facility, which are otherwise connected by a circulation path;

**(1)** Defendant fails to maintain the aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the self-service shelves on an accessible route complying with 402;

**(2)** Defendant fails to maintain the aisles accessible route in operable

condition by conforming with the ADA Standards for Accessible Design so that the required clear walking surfaces and its associated elements are not rendered unusable by the disabled as a result of items obstructing the clear floor walking surface;

**(3)** Defendant fails to maintain the aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals, which includes but is not limited to maintaining the accessible routes clear width at turns and/or passing spaces, which has the discriminatory effects of rendering the aisles, including its goods, as unusable by the disabled;

**(4)** Defendant fails to have or otherwise fails to enforce its policies, practices, or procedures on maintaining in operable working condition the features of the purported accessible route to and throughout the aisles so that the goods and services are readily accessible to and usable by individuals with disabilities;

**(5)** Defendant has ineffective policies, practices, or procedures that ensure the purported accessible route is readily accessible to and usable by individuals with disabilities so that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than individuals without disabilities;

**E.** Defendant provides a toilet room for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of the Defendant:

**(1)** The signage displaying the International Symbol of Accessibility identifying the interior space within the restroom area as ADA accessible fails to be located alongside the door at the latch side;

**(2)** When entering and/or exiting the restroom there is insufficient maneuvering clear floor space for individuals who require mobility devices to approach the door to pull it open and/or maneuver into the toilet room;

**(3)** Defendant maintains a plethora of items in the clear floor space in the hallway at the toilet room door which has the discriminatory effect in practice of prohibiting disabled individuals from the full and equal opportunity to maneuver independently into and throughout the hallway to get to the toilet room;

**(4)** The toilet room door operating hardware fails to be maintained in conformance with the ADA Standards for Accessible Design so that door pulls are provided on both sides and the hardware does not require tight

grasping, twisting, and/or pinching of the wrist;

**(5)**   The toilet room door locking mechanism fails to be maintained in conformance with the ADA Standards for Accessible Design so that the locking mechanism does not require tight grasping, twisting, and/or pinching of the wrist;

**(6)**   The toilet room fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the water closet and its associated elements as unusable by disabled individuals;

**(7)**   The clear floor space around the water closet fails to be maintained in conformance with the ADA Standards for Accessible Design so that the lavatory sink and/or other associated obstructions are not restricting the water closets usability by disabled individuals;

**(8)**   The toilet paper dispenser fails to be properly maintained in conformance with the ADA Standards for Accessible Design so that the dispenser is located 7-9 inches from the front of the water closet;

**(9)**   The toilet paper dispenser fails to be properly maintained in conformance with the ADA Standards for Accessible Design so that the dispenser does not require the use of tight grasping, pinching, or twisting of the wrist

and/or otherwise restrict the continuous flow of paper;

**(10)** The side wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 42 inch long grab bar that is located a maximum of 12 inches from the rear wall and extending a maximum distance of 54 inches from the rear wall, with the top gripping surface of the grab 33-36 inches above the finished floor;

**(11)** The rear wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(12)** The flush control valve fails to be properly located on the transfer side of the water closet;

**(13)** Defendant fails to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

**F.** Defendant provides a lavatory for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** The lavatory fails to be maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(2)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(3)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(4)** The lavatory sink drain pipes are not properly insulated or otherwise protected against contact;

**(5)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

**(6)** There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor. §308.1.

**(7)** There is not at least one lavatory with a soap dispenser that is maintained in a usable condition so that the dispenser does not require the use of two hands to operate and/or require tight grasping, twisting, and/or pinching of the wrist;

**G.** Defendant provides a sales and service counter for able-bodied individuals to transact business and otherwise receive services that are provided at the counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least one of each type of sales counter and service counter that is maintained in conformance with the ADA Standards for Accessible

Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(2)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(3)** There is not  at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the

counter;

**(4)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(5)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(6)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(7)** Defendant fails to maintain the accessible features of the sales/service counter that are required to be readily accessible to and usable by individuals with disabilities;

**H.** Defendant provides food selection counters for able-bodied individuals to receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least one of each type of food selection counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(2)** There is not at least one of each type of food selection counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(3)** There is not  at least one of each type of food selection counter that is

maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(4)** There is not at least one of each type of food selection counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(5)** There is not at least one of each type of food selection counter that is maintained in operable condition with the ADA Standards for Accessible

Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(6)** There is not at least one of each type of food selection counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(7)** Defendant fails to maintain the accessible features of the food selection counter that are required to be readily accessible to and usable by individuals with disabilities;

**I.** Defendant provides self-service drink counters for able-bodied individuals to receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least one of each type of self-service drink counter that is maintained in conformance with the ADA Standards for Accessible Design

in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

(2) There is not at least one of each type of self-service drink counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

(3) There is not  at least one of each type of self-service drink counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(4)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(5)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(6)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(7)** Defendant fails to maintain the accessible features of the self-service drink counters that are required to be readily accessible to and usable by

individuals with disabilities;

26. The Plaintiffs have been from the parking lot to the entrance; from the entrance to the restroom; the restroom itself; from the entrance to the self-serving drink counters; the self-serving drink counters themselves; throughout circulation paths and accessible routes, and service areas, paths of travel, and particularly, but not limited to, all of which is more specifically described below. Moreover, Defendant's facility located at 2620 Lake Austin Blvd, Austin, TX 78703 violates the ADA in the parking lot, restroom, and beverage counter particularly, but not limited to:

J. Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendant's place of public accommodation which includes but is not limited to the following failures of Defendant:

(1) Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by

disabled individuals which includes but is not limited to parking spaces failing to be located on the shortest accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

**(2)** The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the level parking spaces measure 96 inches wide minimum with adjoining compliant access aisles that measure 60 inches wide minimum and connect to an accessible route to the entrance of the establishment;

**(3)** The parking area fails to maintain the required amount of parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles extends the full length of the parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

**(4)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(5)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(6)** The parking area fails to maintain the required amount of parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**K.** Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible van parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at Defendant's place of public accommodation which

includes but is not limited to the following failures of Defendant:

(1) Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to van parking spaces failing to be located on the shortest accessible route to the entrance which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals;

(2) The parking area fails to maintain the required amount of accessible van accessible parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking space measures 132 inches wide minimum with an adjoining compliant access aisle that measures 60 inches wide minimum, or alternatively a 96 inch wide space with an adjoining 96 inch wide access aisle, and connects to an adjoining accessible route to the entrance of the establishment;

(3) The parking area fails to maintain the required amount of accessible van parking spaces, including its associated access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the van parking spaces adjacent access aisle extends the full length of the

parking space and is marked so as to discourage parking in the access aisle which renders it unusable by the disabled;

**(4)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces adjacent access aisles do not overlap the vehicular way;

**(5)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces are identified with signage including the international symbol of accessibility that is mounted 60 inches minimum above the finished floor or ground surface measured to the bottom of the sign;

**(6)** The parking area fails to maintain the required amount of accessible van parking spaces, including its adjoining access aisle, in operable condition by conforming with the ADA Standards for Accessible Design so that the parking spaces and its adjacent access aisles are designed or otherwise maintained in a way so that when cars and vans, when parked, cannot obstruct the required clear width of adjacent accessible routes and render the parking space as unusable by the disabled;

**L.** The Defendant provides a parking area with parking spaces that have routes connecting the parking spaces to the entrance of the establishment for able-bodied individuals, but fails to provide that same level of access by providing an ADA accessible route from the accessible parking spaces to the accessible entrance for non-able-bodied individual which segregates and relegates individuals with disabilities to inferior benefits of the goods and services provided at the Defendant's place of public accommodation which includes but is not limited to the following failures of the Defendant:

**(1)** The Defendant fails to maintain the parking area and its associated accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to providing all of the necessary components on the ADA accessible route to the entrance including without limitation ramps, walking surfaces, and other associated elements which has the discriminatory effects of rendering the parking spaces and its associated elements as unusable by disabled individuals.

**(2)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the adjacent surfaces at transitions at curb ramps

to walks, gutters, and streets are at the same level;

**(3)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the running slope is not steeper than 1:12.

**(4)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the cross slope is not steeper than 1:48.

**(5)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that there are no changes in level other than the running slope and cross slope.

**(6)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design in all the ways that are required to be usable by the disabled which includes but is not limited to providing a ramp that is 36 inches wide minimum with a level landing at the top and bottom of the ramp measure 60 inches long minimum and at least as wide as the ramp;

**(7)** The accessible route fails to maintain a ramp and its associated components in operable condition by conforming with the ADA Standards for Accessible Design so that the curb ramp does not project into vehicular

traffic lanes, parking spaces, or parking access aisles;

**(8)** The Defendant fails to maintain at least one accessible entrance that provides a door conforming to the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by individuals with disabilities which includes but is not limited to maintaining an independently accessible and usable entrance door to the establishment so that disabled individuals are not outright excluded from being afforded the opportunity to enter the establishment;

**(9)** The Defendant fails to maintain an accessible route to the entrance in operable usable condition by conforming with the ADA Standards for Accessible Design so that walking surfaces are not obstructed which has the discriminatory effects in practice of rendering the entire establishment and its goods and services as unusable by disabled individuals;

**M.** The Defendant provides a toilet room for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of the Defendant:

**(1)** The signage displaying the International Symbol of Accessibility identifying the interior space within the restroom area as ADA accessible fails to be located alongside the door at the latch side;

**(2)** When entering and/or exiting the restroom there is insufficient maneuvering clear floor space for individuals who require mobility devices to approach the door to pull it open and/or maneuver into the toilet room;

**(3)** The Defendant maintains a plethora of items in the clear floor space in the hallway at the toilet room door which has the discriminatory effect in practice of prohibiting disabled individuals from the full and equal opportunity to maneuver independently into and throughout the hallway to get to the toilet room;

**(4)** The toilet room door operating hardware fails to be maintained in conformance with the ADA Standards for Accessible Design so that door pulls are provided on both sides and the hardware does not require tight grasping, twisting, and/or pinching of the wrist;

**(5)** The toilet room door locking mechanism fails to be maintained in conformance with the ADA Standards for Accessible Design so that the locking mechanism does not require tight grasping, twisting, and/or pinching of the wrist;

**(6)** The toilet room fails to be maintained in conformance with the ADA

Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the water closet and its associated elements as unusable by disabled individuals;

(7) The clear floor space around the water closet fails to be maintained in conformance with the ADA Standards for Accessible Design so that the lavatory sink and/or other associated obstructions are not restricting the water closets usability by disabled individuals;

(8) The toilet paper dispenser fails to be properly maintained in conformance with the ADA Standards for Accessible Design so that the dispenser is located 7-9 inches from the front of the water closet;

(9) The toilet paper dispenser fails to be properly maintained in conformance with the ADA Standards for Accessible Design so that the dispenser does not require the use of tight grasping, pinching, or twisting of the wrist and/or otherwise restrict the continuous flow of paper;

(10) The side wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 42 inch long grab bar that is located a maximum of 12 inches from the rear wall and extending a maximum distance of 54 inches from

the rear wall, with the top gripping surface of the grab 33-36 inches above the finished floor;

**(11)** The rear wall grab bar fails to conform to the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a 36 inch long grab bar installed so that it is located 12 inches on the closed side of the toilet room and 24 inches on the transfer side and mounted so that the top gripping surface measures 33-36 inches above the finished floor;

**(12)** The flush control valve fails to be properly located on the transfer side of the water closet;

**(13)** Defendant fails to maintain the accessible features of the restroom that are required to be readily accessible to and usable by individuals with disabilities;

**N.** The Defendant provides a lavatory for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to individuals without disabilities, which includes but is not limited to the following failures of the Defendant:

**(1)** The lavatory fails to be maintained in conformance with the ADA

Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effect of rendering the lavatory sink and its associated elements as unusable by the disabled;

**(2)** There is not at least one ADA accessible lavatory that is maintained in a usable condition so that the top surface of the rim on the lavatory sink measures a maximum of 34 inches above the finished floor and positioned for a forward approach;

**(3)** The clear floor space at the lavatory sink fails to be maintained in conformance with the ADA Standards for Accessible Design so that the knee and toe clearance is not restricting the usability by disabled individuals;

**(4)** The lavatory sink drain pipes are not properly insulated or otherwise protected against contact;

**(5)** The paper towel dispenser fails to be maintained in a usable condition so that the dispenser and its operable parts do not require the use of tight grasping, twisting, and/or pinching of the wrist or otherwise restrict the continuous flow of paper;

**(6)** There is not at least one lavatory with a mirror that is maintained in a usable condition so that the bottom reflecting surface of the mirror measures a maximum of 40 inches above the finished floor. §308.1.

**(7)** There is not at least one lavatory with a soap dispenser that is maintained in a usable condition so that the dispenser does not require the use of two hands to operate and/or require tight grasping, twisting, and/or pinching of the wrist;

**O.** The Defendant provides self-service drink counters for able-bodied individuals to receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of the Defendant:

**(1)** There is not at least one of each type of self-service drink counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(2)** There is not at least one of each type of self-service drink counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(3)** There is not  at least one of each type of self-service drink counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(4)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to

maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(5)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

**(6)** There is not at least one of each type of self-service drink counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(7)** The Defendant fails to maintain the accessible features of the self-service drink counters that are required to be readily accessible to and usable by individuals with disabilities;

27. To date, the barriers to access, at each establishment location referenced above, and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

28. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. §12205.

29. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant the Plaintiffs' injunctive relief, including an Order to alter the discriminating facility to make it readily accessible to, and usable by, individuals with disabilities to the extent required by the ADA, and closing the facility until the requisite modifications are completed, and to further order the Defendant to modify its policies, practices, and procedures, to provide equal use of its facilities, services and benefits to disabled individuals.

## COUNT TWO
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(ii)
### *(Practices, procedures, and policies denying equal benefits)*

### ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers

30. The Plaintiffs re-allege paragraphs above.

31. The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

32. The ADA, Title III, specifically makes it unlawful to provide individuals with

disabilities with an unequal benefit, and to relegate individuals with disabilities to a different or separate benefit. 42 U.S.C. §§ 12182(b)(1)(A)(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs and mobility aids historically have been provided "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." *See* 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

33. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."   42 U.S.C. §

12101(a)(5).

34. To address this broad range of discrimination in the context of public accommodations, Congress enacted ADA, Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

35. By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities more than simple physical access. Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); *see also*, H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well,

discrimination in the provision of programs and activities conducted by the public accommodation.").

36. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in *Rendon v. Valleycrest Prod., Ltd*., 294 F.3d 1279, (11th Cir. 2002) that:

> *A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both tangible barriers (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendants entity's goods, services and privileges.*

## Defendant's Failed Practices and Lack of Policies Are Discriminatory

37. Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> *[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.*

38. Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled. Similarly, a place of public accommodation must not have a policy or practice that "has a discriminatory effect in practice" of preventing disabled individuals from realizing the full and equal enjoyment of the goods and services the public accommodation offers to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

39. As detailed below, the Defendant has failed to make reasonable modifications in its policies, practices, and procedures that are necessary to afford its goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, the Defendant denied services, segregated or otherwise treated the Plaintiffs differently than individuals who are not disabled. Pursuant to 42 U.S.C. § 12182(b)(2)(A), the Defendant has discriminated against the Plaintiffs. The Defendant will continue that

discrimination forever until enjoined as the Plaintiffs request. The discrimination is described more particularly in the following paragraphs.

40. The Defendant either has no policies, practices, and procedures to remove architectural barriers or else it does not abide by them. The rampant architectural barriers previously identified in Count One establishes that the Defendant has failed to create, adopt, and/or implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

41. The Defendant's use of its facility, and its practices at the facility located at 1403 S Lamar Blvd, Austin, TX 78704; 2820 S Lamar Blvd, Austin, TX 78704; and 2620 Lake Austin Blvd, Austin, TX 78703, literally creates barriers and in so doing denies the Plaintiffs the full and equal enjoyment of the facilities. Those practices include:

   (a) The Defendant makes its parking area inaccessible for use by the disabled by failing to provide ADA accessible parking with connecting accessible routes to the establishment from its parking lot, which means that the Plaintiffs are forced to depend on assistance from a third party to get into the facility, whereas the non-disabled conveniently access the establishment without the need of third party assistance;

   (b) The Defendant fails to provide an ADA accessible route throughout the facility;

**(c)** The Defendant makes the counters inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counters, which means Ms. King cannot fully and equally use the counters in the way the non-disabled do, because the non-disabled can use the counters;

**(d)** The Defendant makes its toilet facility inaccessible for use by the disabled by failing to maintain any ADA accessible elements within the restroom so that the Plaintiffs are afforded the opportunity to independently use the restroom, or clean up, or move into and throughout the restroom, whereas non-disabled individuals have independent use of the restroom;

**(e)** The Defendant fails to provide a place for the disabled to enjoy the goods and services like the able-bodied;

**(f)** The Defendant makes its environment inaccessible for the disabled so that the Defendant might as well hang a sign saying disabled people are not welcome;

**(g)** The Defendant, according to its own publicly available information, lacks any policies, practices, and/or procedures that ensure the use of its allegedly compliant facility complies with the ADA;

**(h)** The Defendant's policies, practices, and procedures are conducted without regard to disabled individuals;

**42.** As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendant has no policies, practices, or

procedures, or else it has failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

43. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendant's existing practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by the disabled.

44. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendant has no  policies, practices, and procedures or else it failed to create, implement, and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at its facility as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of 7-Eleven, as described above in detail.

45. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, the Defendant has failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

46. To date, the Defendant's discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges,

advantages, or other accommodations to individuals with disabilities.

47. A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiffs hereby demand that the Defendant both create and adopt a corporate practice and policy that the Defendant (1) will fully comply with Title III, ADA, and all its implementing regulations so that architectural barriers identified above are permanently removed from the Defendant's convenience store consistent with the ADA; (2) the Defendant will provide the disabled, including those with mobility limitations full and equal use and enjoyment of  7-Eleven; (3) 7-Eleven will modify its practice of making ADA Title III architectural barrier remediations only upon demand by the disabled.

48. As pled above, 7-Eleven, Inc., owns and operates the real properties and its improvements in which the 7-Eleven convenice stores are located at 1403 S Lamar Blvd, Austin, TX 78704; 2820 S Lamar Blvd, Austin, TX 78704; and 2620 Lake Austin Blvd, Austin, TX 78703. Therefore, pursuant to 42 U.S.C. § 12182, 7-Eleven is responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

49. The ADA is over twenty-five (25) years old. The Defendant knows it must comply with the ADA Title III. The ADA Title III requires modifications in

policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

**50.**   By this Complaint, the Plaintiffs provide sufficient notice of their demand for an alteration in the Defendant's policies, practices, and procedures.

**51.**   The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

**52.**   Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal policies, practices, and procedures.

**COUNT THREE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
***Denial of Full and Equal Enjoyment***

**53.**   The Plaintiffs re-allege paragraphs above.

**54.**   42 U.S.C. § 12182(a) provides:

> *No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.*

**55.**   Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms

for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

56. Congress also found that: "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities, 42 U.S.C. § 12101(a)(5); "the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;" 42 U.S.C. § 12101(a)(7). Congress even found that: "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 U.S.C. § 12101(a)(8).

57. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear,

strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

58. The ADA provides, *inter alia*, that it is discriminatory to subject an individual or class of individuals based on a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

59. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability . . . with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

60. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). The Defendant's acts and omissions alleged herein are in violation

of the ADA, 42 U.S.C. §§ 12101, *et seq*., and the regulations promulgated thereunder.

61.  To address this broad range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); *see also* H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

62.  For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that

excludes   individuals   with   disabilities   from   services.   42   U.S.C.   §
12182(b)(1)(A)(i).

63.   The keystone for this analysis is the Defendant must start by considering how its

facility is used by non-disabled guests and then take reasonable steps to provide

disabled guests with a like experience. *Spector v.  Norwegian Cruise Line Ltd.,*

545   U.S.   119,   128–29,   125   S.Ct.   2169,   162   L.Ed.2d   97   (2005);   *see   also*,

*Baughman v.  Walt Disney World Company*, 685 F.3d 1131, 1135 (9th Cir. 2012).

64.   The Plaintiffs were denied full and equal access to 7-Eleven stores referenced

above. The Plaintiffs specifically and certainly want to return to the Defendant's

convenience store. More specifically, the Plaintiffs want to be afforded the same

level   of   service   that   is   offered   to   non-disabled   individuals   and   which   the

Defendant has failed to provide to the Plaintiffs as follows: the Defendant failed

to   provide   an   accessible   parking   area   and   accessible   route   for   disabled

individuals, which means the Plaintiffs cannot park, cannot independently get out

of the car and onto his wheelchair, cannot independently travel from the parking

area into the establishment, cannot determine if there is a usable parking space,

and   must   determine   by   trial   and   error   how   he   is   to   park   and   move   into   the

convenience store; the Defendant failed to provide an accessible route from the

parking to the entrance throughout the facility; the Defendant failed to provide

accessible counters; the Defendant failed to provide an accessible restroom for

disabled individuals, which means that, unlike the able-bodied, the disabled are challenged or denied the opportunity to independently use the restroom, clean up after using the restroom, move throughout the restroom, and prohibited from using all the other elements of the restroom; the Defendant's continued failure to maintain ADA accessibility as an integral part of the highest possible experience that non-disabled individuals get to independently enjoy has segregated or otherwise treated the Plaintiffs and others similarly situated differently, in that, 7-Eleven makes Mrs. King dependent on family or an independent third party which is not the same experience that 7-Eleven affords to non-disabled individuals, and all the foregoing failures by the Defendant inhibited the Plaintiffs from having the same experience that non-disabled individuals have when at 7-Eleven.

65. In its Preamble to the Title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of second-class citizens. 28 C.F.R. pt. 36, App. B, § 36.203.

66. The ADA specifically makes it unlawful to provide individuals with disabilities

with an unequal benefit, and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A)(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided inferior seating and segregated accommodations compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." *See* 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

67. Thus, the Defendant's use of the accessible features constitutes statutory discrimination in violation of the ADA, because the Defendant has segregated and separated the disabled from the non-disabled individuals. "The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." *H.R. Rep. No. 101-485(III),* at 50*, 1990 U.S.C.C.A.N* at 473*.* The ADA provides a broad mandate to "eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life." *PGA Tour,*

*Inc. v. Martin*, 532 U.S. 661, 675; 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332).

68. The Defendant discriminated against the Plaintiffs by denying the Plaintiffs "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied the Plaintiffs an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of Big A.

69. The Defendant's conduct and the Defendant's unequal treatment to the Plaintiffs constitute continuous violations of the ADA and absent a Court ordered injunction from doing so, the Defendant will continue to treat the Plaintiffs and others similarly situated unequally.

70. The Defendant's failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitutes continuous discrimination and absent a Court ordered injunction, the Defendant will continue to not maintain the required accessible features at Defendant's facility. 28 C.F.R.§ 36.211(a).

71. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C.

§ 12205.

72. Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of the Defendant.

## COUNT FOUR
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12183(a)(1)
### *(Failure to design and construct facility for ADA compliance)*

73. The Plaintiffs re-allege paragraphs above.

74. 42 U.S.C. § 12183(a)(1) provides:

> *[Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.*

75. Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination . . . continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." *Id.* § 12101(a)(5). In its Preamble to the Title III

regulation, the Department of Justice recognized that persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of second-class citizens. 28 C.F.R. pt. 36, App. B, § 36.203.

76.  To eliminate such segregation Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities". This very requirement is intended to enable persons with disabilities "to get to, enter and use a facility." H.R. Rep. No. 101- 485(III), at 499-500 (1990). It requires "a high degree of convenient accessibility," *id.*, as well as access to the same services that are provided to members of the general public. "For new construction and alterations, the purpose is to ensure that the service offered to persons with disabilities is equal to the service offered to others." *Id.*

77.  As the legislative history makes clear, the ADA is geared to the future -- the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide access in existing facilities, while requiring all new construction to be accessible. H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

78.  To realize its goal of a fully accessible future, Congress required that all newly

constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design ("Standards") are incorporated into the Department of Justice's regulation implementing Title III of the ADA, 28 C.F.R. Part 36, Appendix.

79. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facility, from parking areas, interior walkways and entrances, common areas, seating, restrooms, and sales/service areas.

80. The Defendant was and is required to design and construct the 7-Eleven convenience stores to be "readily accessible to and usable by individuals with disabilities." Defendant violated the statute by failing to design and construct its convenience stores to be readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. Defendant further violated the statute by failing to design and construct its convenience stores in compliance with the ADA during planned alterations as described throughout this Complaint.

81. To date, the Defendant's discriminating actions continue.

82. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C.

§ 12205.

83. Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal actions by the Defendant.

**COUNT FIVE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12182(a) and 28 C.F.R. § 36.302 (e)(1)(i)-(ii)**
***(Failure to Integrate Website Accessibility)***

84. The Plaintiffs incorporate by reference and reallege all the paragraphs above.

85. The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. H. Rep. 101–485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479. "The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." Id. at 50, 1990 U.S.C.C.A.N. at 473.

86. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."   42 U.S.C.

12101(a)(5).

**87.** Legislative history indicates that websites of public accommodations are covered by Title III. Although the internet did not exist when Congress enacted the ADA in 1990, the legislative histories state that Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations.  Consequently, it is consistent with Congressional intent to include within Title III's coverage the goods and services provided by public accommodations through their websites.  See Nat'l Fed'n of the Blind v. Scribd, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

**88.** The Justice Department has long affirmed the application of Title III to the websites of public accommodations. The statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet." 75 Fed Reg. 43,460, 46,463 See also Netflix, 869 F. Supp. 2d at 200 (excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc., 37 F.3d 12, 20 (1st Cir. 1994).

**89.** Today, internet technology enables individuals to participate actively in their

community and engage in virtually all forms of commerce from the comfort and convenience of their home, to the extent that virtual reality through the internet is almost as important as physical reality in brick-and-mortar constructed public accommodations, in pursuing commerce from public accommodations. That websites were not explicitly written into the ADA at its passage in the early 1990s but are nevertheless covered does not indicate ambiguity in the ADA, but rather the breadth of the ADA. Andrews v. Blick Art Materials, LLC, No. 17-CV-767, 2017 WL 3278898, (E.D.N.Y. Aug. 1, 2017).

90. The Defendant did not allow Mrs. King to use the website in the same manner as individuals without disabilities, because the website fails to integrate alternative platforms that enable disabled individuals who have limited use of their hands the opportunity to use the alternative platforms to navigate and select items on the page. The able-bodied online website user can only use a mouse to navigate, whereas individuals who have limited use of their hands cannot use assistive technology to navigate through the website. Moreover, the Defendant provides a plethora of services and associated benefits, including but not limited to rewards, gift cards, store locations, online shopping, among other services to able-bodied individuals, but fails to provide those same services to disabled individuals which relegates and otherwise segregates disabled individuals to inferior benefits and services of 7-Eleven.

91.   The design of the Defendant's web site impedes Mrs. King and others similarly situated from accessing the services, privileges and accommodations afforded able-bodied patrons through the web platform. The website fails to integrate alternative access methods that allow a person with limited manual dexterity to access the information and navigate the web site without being able to use a mouse. That is, the website design does not provide for functions to be carried out using a keyboard or voice input. On its website, the Defendant provides a plethora of services and associated benefits, including but not limited to including but not limited to rewards, gift cards, store locations, online shopping, among other services to the general public, but fails to provide those same services to persons with disabilities. Such actions relegate and otherwise segregate persons with disabilities to inferior benefits and services offered by 7-Eleven.

92.   As pled previously, intangible barriers to access are prohibited, just as tangible barriers are prohibited.

93.   The actions by the Defendant violate:

(a) 42 U.S.C. § 12182(a), because its actions deny the Plaintiffs full and equal enjoyment of the Defendant's goods and services;

(b) 42 U.S.C. § 12182(b)(1)(A)(i), because the Defendant's actions deny the Plaintiffs equal participation in goods and services offered by the Defendant;

(c) 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because the Plaintiffs are provided

both separate and unequal benefits of the Defendant's goods and services;

(d) 42 U.S.C. § 12182(b)(1)(B), because the Defendant does not provide their goods and services in the most integrated setting appropriate;

(e) 28 C.F.R. 36.303(c), because the Defendant has failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiff.

94. The Plaintiffs do not allege that there are specific mandatory regulations for websites that establish compliance or non-compliance as a matter of law. The Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, the Defendant should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.1 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

95. To date, the Defendant's discriminating actions continue.

96. As pled above, 7-Eleven, Inc., is the "owner" of the public internet website www.7-eleven.com and "operates" the world-wide websites services that are

available to the public at 7-Eleven stores. Therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services, as alleged above. 42 U.S.C. § 12182.

97. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

98. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by the Defendant.

**COUNT SIX**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(2)(A)(iii)**
***(Failure to Provide Services Necessary to***
***Ensure Equal Access to Innovative Technology)***

99. The Plaintiffs incorporate by reference and reallege all the paragraphs above.

100. The ADA was the most sweeping civil rights legislation since the Civil Rights Act of 1964. When it was enacted Congress had no conception of how the Internet would change global commerce. "[W]e were not communicating by e-mail, blog, or tweet; we were not filling virtual shopping carts with clothes, books, music, and food; we weren't banking, renewing our driver's licenses, paying taxes or registering for and taking classes online. Congress could not have

foreseen these advances in technology. Despite Congress' great cognitive powers, it could not have foreseen these advances in technology which are now an integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace." Achieving the Promises of the Americans with Disabilities Act in the Digital Age—Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary, 111th Cong., 2d Sess. 111–95 (2010).

101. Since the internet plays such a critical role in the personal and commercial lives of Americans, excluding disabled persons from access to covered entities that use the internet and mobile applications as a means of reaching the public would defeat the purpose of this important civil rights legislation. Today, places of public accommodation are increasingly using mobile applications ("mobile apps") to provide services, benefits and goods more effectively to the public and expand the services the public accommodation has to offer in new ways. These services that are provided via a public accommodation for web applications, mobile application, and hybrid applications ("mobile platform") also need to be provided to disabled individuals.

102. ADA Title III states that discrimination includes "a failure to take such steps as

may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Auxiliary aids and services include . . . accessible electronic and information technology, among other methods.  28 C.F.R. § 36.303(b). Auxiliary aids and services include acquisition or modification of equipment or devices, and other similar services and actions. 28 C.F.R. 36.303(b)(3)-(4).

103. The plain language of these statutory provisions applies to discrimination in offering the goods and services ''of'' a place of public accommodation or the services, programs, and activities ''of'' a public entity, rather than being limited to those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

104. The ADA and the Title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective

communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication between the two. Defendant has chosen to provide a service through a mobile application for rewards, gift cards, store locations, online shopping, among other services among many other services through the mobile platform. The Defendant communicates all of that to able-bodied individuals as a service. Yet, the Defendant's use of its mobile application and the services it offers through the application does not communicate and provide services to the disabled individuals. This is contrary to the broad mandate of the ADA which prohibits not only outright exclusion but also unnecessary differential treatment. See 42 U.S.C. §§ 12182(a), (b)(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "…the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities."  See H.R. Rep. No. 485, pt. 2, at 108 (1990).

105. The unlawful implementation of eligibility criteria in other contexts that are clearly covered by the Act is analogous to the Defendant's effective screening of

Plaintiffs from using its mobile app. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. See Section 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if the Defendant screened guests as they entered, sending home guests on the grounds that they were deaf or physically disabled or suffered from diabetes or any other disability. See 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater."). ("An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store'. Accordingly, the site of the sale is irrelevant. All that matter is whether the good or service is offered to the public.  (Nat'l Fed'n of the Blind. Scribd Inc., 97 F. Supp. 3d 565 (D. Vt. 2015). The Defendant's failure to permit or include assistive technology in relation to their mobile app directly and physically screens and prevents the Mrs. King from being able to use the mobile app, just as if the Defendant in their establishment placed items outside the Plaintiff's reach and said the Plaintiffs cannot have the items unless the Plaintiffs can get the items for themselves.

106. In our contemporary technological society, "excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." Netflix, 869 F.Supp.2d at 200 (quoting *Carparts*, 37 F.3d at 20). (quoting *Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015).

107. The Defendant diminish the Plaintiff's rights under the ADA to fully participate in all aspects of society, which is counter to Congress' goal. Defendant's ableism, as described throughout the Complaint, is excluding the Plaintiffs from equality of opportunity, full participation, independent living, and economic self-sufficiency and in doing so excludes the Plaintiffs from a plethora of goods and services that are offered through the mobile platform which includes but is not limited to the following:

   (a) The Defendant are excluding, denying services, and otherwise segregating the Plaintiff from all of the benefits and services the Defendant offers through their mobile apps as a result of their failure to modify their mobile application platform to allow assistive technology, which includes, but is not limited to, voice recognition, alternative input methods, assistive touch functions, among other accessibility methods that the Plaintiff require, to

compete on an equal basis and maintain independent self-sufficiency;

**(b)** The Defendant is excluding, denying services, or otherwise segregating the Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from the Defendant's services that enables individuals to view promotions through the mobile apps;

**(c)** The Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from the Defendant's services that enables individuals to view the various options at 7-Eleven through the mobile apps;

**(d)** The Defendant is excluding, denying services, or otherwise segregating the Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from the Defendant's services that enables individuals to view and select features through the mobile apps;

**(e)** The Defendant is excluding, denying services, or otherwise segregating the Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from the Defendant's services that enables individuals to view and access rewards, store locations and shop online through the mobile apps;

**(f)** The Defendant is excluding, denying services, or otherwise segregating the Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from the Defendant's services that enables individuals to access

and view all the benefits of 7-Eleven through use of the mobile apps;

(g) The Defendant is excluding, denying services, and otherwise segregating the Plaintiff as a result of their failure to modify equipment, devices and/or other similar services. 28 C.F.R. § 36.303(b)(3)-(4).

(h) The Defendant is excluding, denying services, or otherwise segregating the Plaintiff of all the goods and services offered on its mobile apps as a result of the Defendant's failure to design their mobile apps that enable alternative assistive technology;

108. The design of the Defendant's mobile app impedes the Plaintiff and others similarly situated from accessing the services, privileges and accommodations afforded patrons through the mobile app. The mobile app fails to integrate alternative access methods that allow a person with limited manual dexterity in their hands to access the information and navigate the mobile app.

109. The actions by the Defendant violate:

(a) 42 U.S.C. § 12182(a), because the Defendant's action denies the Plaintiffs full and equal enjoyment of the Defendant's goods and services;

(b) 42 U.S.C. § 12182(b)(1)(A)(i), because the Defendant's actions deny the Plaintiffs equal participation in goods and services offered by the Defendant;

(c) 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because the Plaintiffs are provided both separate and unequal benefits of the Defendant's goods and services;

**(d)** 42 U.S.C. § 12182(b)(1)(B), because the Defendant does not provide its goods and services in the most integrated setting appropriate;

**(e)** 28 C.F.R. 36.303(c), because the Defendant has failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled the Plaintiffs.

110. The Plaintiffs do not allege that there are specific mandatory regulations for mobile applications that establish compliance or non-compliance as a matter of law. Plaintiffs plead, consistent with the Department of Justice determinations, that in achieving such conformance and usability of mobile apps by individuals with disabilities, the Defendant should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.1 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

111. To date, the Defendant's discriminating actions continue.

112. As pled above, 7-Eleven, Inc. "owns" and "operates" the 7-Eleven mobile application and its goods and services offered on the mobile app, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and

maintaining policies, practices and procedures, as alleged above.

113. The Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. They are entitled to have their reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

114. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by the Defendant.

**WHEREFORE**, premises considered, the Plaintiffs demand judgment against the Defendant on Counts One through Six and request the following injunctive and declaratory relief:

1. That the Court declare that the properties are owned and operated by the Defendant as well as all the Defendant's illegal actions described herein violate the ADA, as specifically described above;

2. That the Court enter an order enjoining the Defendant to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and its implementing regulations, as stated in Count One;

3. That the Court enter an order, in accordance with Count Two, directing the Defendant to modify its policies, practices, and procedures both to

remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin the Defendant to make its business practices consistent with ADA Title III in the future;

4. That the Court enter an order directing the Defendant to provide the Plaintiffs full and equal access both to the 7-Eleven experience and to the use of the establishments, and further order the Defendant to maintain the required accessible features at the establishments so that the Plaintiffs and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5. That the Court enter an Order directing the Defendant to evaluate and neutralize its policies, practices, and procedures towards persons with disabilities for such reasonable time to allow them to undertake and complete corrective procedures;

6. That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to the Plaintiffs; and

7. That the Court enjoin the Defendant to remediate the 7-Eleven stores to the proper level of accessibility required for the design and construction of the facility for first occupancy, as stated in Count Four;

8. That the Court enter an order requiring that the Defendant adopt and implement a website accessibility policy and take the necessary actions

to make their website accessible to the Plaintiffs, as particularly described in Count Five;

9. That the Court enter an order requiring the Defendant to place on its homepage a statement concerning its website accessibility policy; provide training to all their workers and associates who write or develop programs or code; and test their website quarterly to identify and repair any incidence of nonconformance;

10. That the Court enter an order requiring the Defendant to adopt and implement a mobile application accessibility policy and take the necessary actions to make their mobile application accessible to the Plaintiffs, as particularly described in Count Six;

11. That the Court enter an order requiring the Defendant to place on its mobile application a statement covering their mobile application accessibility policy; provide training to all their workers and associates who write or develop the programs and code for the mobile application; and test the mobile application quarterly to identify and repair any indication of non-conformance;

12. That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to the Plaintiffs.

13. That the Court award such other, further, and different relief as it deems

necessary, just, and proper.

Respectfully Submitted, this 20th day of March 2019.

/s/ __*Amanda L. Powell*_____

**AMANDA L. POWELL**
**TX Bar No. 24081104**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4032 p
334.819.4032 f
ALP@ADA-Firm.com
*Attorney for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day filed with the Clerk of Court the aforementioned Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly addressed this 20th day of March 2019 to the following:

**7-ELEVEN, INC.**
c/o Corporate Creations Network Inc.
Attn.: Registered Agent
2425 W Loop South #200
Houston, TX 77027

/s/  *Amanda L. Powel*
**AMANDA L. POWELL**
**TX Bar No. 24081104**
ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
ALP@ADA-Firm.com
*Attorney for the Plaintiffs*